UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| PAMELA DONAHUE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:08-cv-65-SEB-JMS |
| | ) | |
| CBRL GROUP, INC. d/b/a CRACKER | ) | |
| BARREL OLD COUNTRY STORE, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment
[Docket No. 56] filed on December 17, 2008, pursuant to Federal Rule of Civil Procedure
56.  Plaintiff, Pamela Donahue, brings her claim against her former employer, Defendant,
CBRL Group, Inc. d/b/a Cracker Barrel Old Country Store, Inc. ("Cracker Barrel"), for its
allegedly discriminatory actions toward her based on her age, in violation of the Age
Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*.  On January 20,
2009, Ms. Donahue filed a Motion to Strike [Docket No. 64] various exhibits submitted
by Cracker Barrel.  For the reasons detailed in this entry, we <u>DENY</u> Plaintiff's Motion to
Strike and <u>GRANT</u> Defendant's Motion for Summary Judgment.

**Factual Background**

In October 1991, Pamela Donahue was hired as a server at Cracker Barrel Store 116 in Indianapolis, Indiana.  She began her employment as a Personal Achievement Responsibility ("PAR") 0-level employee, but during her tenure, she was promoted four times between 1991 and 1999 until she reached the PAR IV level, the highest level of achievement for her position.[1]  Deposition of Pamela Donahue ("Donahue Dep.") at 84. In addition to her work as a server, Ms. Donahue also worked as a lead trainer for a portion of her employment, until she was terminated on October 27, 2006.  Id. at 80.  As a lead trainer, she was responsible for training new employees on day-to-day duties of servers.  Id. at 81-82.

Prior to the events which culminated in her termination, Ms. Donahue had not received a guest complaint, employment counseling or any other disciplinary action in her fifteen-year tenure with Cracker Barrel.  Additionally, the two most recent "server evaluations" contained in her personnel file (both issued in 2006) rated her at ninety-six percent.

*Cracker Barrel's Public Accommodations Policy*

In May 2004, the United States Department of Justice ("DOJ") completed a lengthy investigation of Cracker Barrel based on allegations of a pattern and practice of

---

[1] PAR is a self-paced system of promotions, under which an hourly employee can progress at his or her own pace through the levels associated with his or her position.

customer discrimination in violation of Title II of the Civil Rights Act of 1964.

Following the investigation, as part of a consent decree, Cracker Barrel agreed to "create

and adopt a revised customer non-discrimination policy designed to avoid discrimination

against customers based on their race or color."  Def.'s Br. at 1; see also Exh. A (DOJ

Press Release).  Cracker Barrel also agreed to: publicize its new policy to in-store

customers, on its website, and in its marketing and promotional materials; create a multi-

faceted program training program for its managerial and hourly employees to reinforce

the policy; create an investigative unit to investigate customer complaints of

discrimination; and prepare quarterly progress reports to the DOJ.

Pursuant to the Consent Decree, in May 2004, Cracker Barrel created its Public

Accommodations Policy ("the Policy") and its Guest Relations Department was tasked

with enforcing and investigating purported violations of the Policy.  The Policy prohibits

Cracker Barrel employees from discriminating, or conveying the perception of

discrimination, against any Cracker Barrel guest on the basis of race, color, age, national

origin, gender, religion, disability or sexual orientation.  According to Linda George, the

Employee Training Coordinator at Store 116, the Policy is published in all employee

break rooms, the employee handbook, and in all PAR promotional testing materials.   As

a condition of employment, Cracker Barrel's hourly employees are required to read and

sign a form in which they agree to abide by the Policy and are required to recommit to the

Policy through video and e-learning training throughout their employment.  Declaration

of Linda George ("George Decl.") ¶ 8.

3

Cracker Barrel's customers are also made aware of the Policy in various ways. The toll-free Guest Relations Hotline number and information regarding Cracker Barrel's commitment to non-discrimination are posted on a sign in the vestibule of each Cracker Barrel Store, on "table tents" displayed on tables, on guest receipts, and on Cracker Barrel's website.  Id. ¶ 9.  Pursuant to the Consent Decree, if a customer complaint implicating the Policy is reported, either in the store or to the hotline, a mandatory procedure for investigating and resolving the complaint is followed by Cracker Barrel's Guest Resources department.  Declaration of Deborah Pincus ("Pincus Decl.") ¶¶ 6-7.

Ms. Donahue testified in her deposition that, as a fifteen-year employee of Cracker Barrel, she knew its policies "like the back of [her] hand."  Donahue Dep. at 93.  She received and read a copy of Cracker Barrel's employee handbook as well as all of the updates to the handbook that took place throughout her years of employment. Additionally, as a lead trainer at Cracker Barrel, Ms. Donahue was responsible for reviewing the company's anti-discrimination policies[2] with newly hired employees.  On May 27, 2004, Ms. Donahue was initially trained on the Public Accommodations Policy and then on April 15, 2005, and September 9, 2006, she received a refresher computer course on the Policy.  Id. at 119-120.

---

[2] Such policies include: the Open Door reporting policy, anti-harassment and anti-discrimination policies, Cracker Barrel's Pleasing People Pledge, and an Equal Employment Opportunity statement.  George Decl. ¶ 7.

4

*Plaintiff's Termination*

At approximately 8:00 a.m. on October 27, 2006, two guests, Michael and Karen Perry, visited Store 116 and were served by Ms. Donahue.  According to Ms. Donahue, the Perrys ate breakfast at Store 116 approximately three times per week and Mr. Perry always asked to be waited on by either Ms. Donahue or another server, Patti Green.  On this particular visit, Mr. Perry requested Ms. Donahue as his server and after she brought the Perrys' coffee, Mr. Perry initiated a conversation with Ms. Donahue about allegations of discrimination brought against Cracker Barrel by comedian Chris Rock's mother, Rose Rock, that had recently been covered in the news media.  Donahue Dep. at 138.

In her deposition, Ms. Donahue testified that the conversation that she had with the Perrys proceeded as follows:

> And then, when I went back, [Mr. Perry] asked me, he says, so what do you think about Chris Rock's mom?
>
> And I said, I think she's an idiot.
>
> And he says, how so?
>
> And I said, well, anybody that says she sat in any restaurant, no matter where you're at, for a half hour before you get served, you're an idiot.  Go somewhere else, and take your money or leave.
>
> And he says, well, what?
>
> I said, well, she either went and got whoever sat her down and stood up and yelled, hello, I'm over here.  And I waved my hands in the air.  And the dining room was full.  Everybody looked over at me.
>
> And I said, [Mr. Perry], see the response I got?  That's what she should have done.

5

He said, yeah, but she didn't.

I said, no.

He said, well, you know they're going to sue.

I said, well, yeah.

He said, you know they're going to make lots of money.

I says, yes.

He says, well, how much do you think?

I said, [Mr. Perry], they are black.  Cracker Barrel will settle out of court so it is not public knowledge.  If it's public knowledge, you and I can find out how much they can get, and they don't want that, so they'll settle out of court.

Donahue Dep. at 138-140.

At that point, the conversation ended and Ms. Donahue walked to the kitchen to retrieve more coffee.  Following the conversation, Mr. Perry related the story to server Patti Green, who had taken over the Perrys' table from Ms. Donahue, and told her that he was upset by the comment that Ms. Donahue had made referring to Mrs. Rock's race. The Perrys did not address the issue directly with Ms. Donahue nor asked to speak with a manager before they left.  However, Mr. Perry called Cracker Barrel's toll-free hotline to report his complaint, stating that, after he told Ms. Donahue that he thought it was sad that Chris Rock's mother had to wait thirty minutes to be waited on, Ms. Donahue responded, "[W]ell you know they are black so they'll get what they want. . . . [T]hat's

how it goes and the blacks always get what they want."[3]  Martin Decl. Exh. 3 (Guest

Relations Ticket #625454).  Mr. Perry stated that he was offended by Ms. Donahue's

comment and that "I do not want to be served by a bigot and will not eat there if I have to

be served by her."  Id.

　　　　When a customer calls into the toll-free hotline, a computerized record of the

complaint called a Guest Resources Ticket is generated.  Cracker Barrel's management

personnel can then make notes on the ticket regarding their investigations, witness

interviews, documents received, and conclusions.  When notations are made on the ticket,

the name of the representative who made the change and the date on which the change

was made is recorded.  Pincus Decl. ¶ 10.  According to Cracker Barrel, around 12:30

p.m., the Perrys' ticket, Guest Resources Ticket 625454 ("the Ticket"), was forwarded to

Cracker Barrel's Employee Relations Manager, Anita Martin, who was assigned to

investigate the complaint.  At 12:56 p.m., Ms. Martin noted in the Ticket that she had

spoken with General Manager Todd Brenneke who had told her that the Perrys had

approached Ms. Green when they were leaving and told Ms. Green about the comment

Ms. Donahue had made.  See Martin Decl. Exh. 3.  Cracker Barrel contends that Ms.

Martin then instructed Mr. Brenneke to obtain a written statement from Ms. Donahue

regarding her version of the conversation.

---

[3] On November 3, 2006, Mr. Perry called the hotline a second time to clarify that he did
not feel that Ms. Donahue had discriminated against him, but that he thought it was important for
the server and manager to know that it was not right to make a comment like the one she had
made.  He stated that he had felt tension upon his return to Cracker Barrel and just wanted
everyone to leave it alone.  Martin Decl. Exh. 3.

Ms. Donahue contends that, at about 2:15 p.m. that same day, Mr. Brenneke called her into his office and showed her the written transcript of the verbal complaint the Perrys had made to Cracker Barrel's hotline.  According to Ms. Donahue, after reading the complaint, she told Mr. Brenneke that the Perrys' account was inaccurate.  Despite her alleged denial, Ms. Donahue contends that Mr. Brenneke told her that, while it was not his choice, the home office had instructed him to terminate her.  She further contends that it was only after he had informed her that she was being discharged that he asked her to make a written statement of her side of the story, which she did.  Donahue Dep. at 152-156.  In her written statement, dated October 27, 2006, the same day of the interaction with the Perrys, Ms. Donahue reported that she had told the Perrys that Chris Rock's mother "will get what [she] sue[s] for," and "they were black, so they would get it," but that she "said it as a friend to a friend" and "if a friend didn't want to know what another friend thought don't ask."[4]  Donahue Dep. Exh. 15.

Cracker Barrel does not dispute that Mr. Brenneke informed Ms. Donahue that she was being terminated on October 27, 2006, around 2:00 p.m.  However, according to Cracker Barrel, at that point, it had already received Ms. Donahue's written complaint

---

[4] In her July 31, 2008, deposition, Ms. Donahue testified that her written statement was an accurate and truthful recount of her conversation with the Perrys.  Donahue Dep. at 156.  However, later in her deposition she testified that she was upset at the time she wrote the statement and that she did not write what she actually said out correctly in her written statement.  Id. at 176.  Ms. Donahue contends that what she actually meant when she wrote it was that she had told the Perrys only "[t]hat [the Rocks] were black, that Cracker Barrel would settle out of court."  Id. at 159.  However, she concedes that her written statement was provided to Cracker Barrel after she was terminated and that she never provided any other version of events to Cracker Barrel.  Id. at 160.

basically corroborating what the Perrys had reported on the hotline.  After reviewing the facts before her, Ms. Martin determined that Ms. Donahue's comment violated Cracker Barrel's Public Accommodations Policy and concluded that Ms. Donahue should be terminated for the violation.  Since Ms. Donahue had been employed with Cracker Barrel for fifteen years, before instructing Mr. Brenneke to fire her, Ms. Martin consulted with Regional Vice President Kathy Dilley, who approved the termination.[5]  Cracker Barrel contends that it was only at that point that Ms. Martin instructed Mr. Brenneke to terminate Ms. Donahue effective immediately.  According to Ms. Martin, she did not look up Ms. Donahue's age as part of her investigation nor did she (Ms. Martin) have any independent knowledge of that information.  Ms. Martin then forwarded the Perrys' complaint to Cracker Barrel's Guest Resources Department to follow-up with the guests and begin its mandatory investigation process under the Consent Decree.

After she was terminated, Ms. Donahue called Cracker Barrel's Employee Relations Hotline to complain about her termination, but did not tell the representative that she felt her termination was based on her age, or that it was discriminatory in any other way.  She also spoke with her District Manager, Patrick Armstrong, about her termination, but again did not mention discrimination of any kind.  Rather, she complained that the incident had not been properly investigated and that there were other,

---

[5] Ms. Donahue contends that Ms. Martin could not have reviewed any facts with Ms. Dilley at that time because Ms. Martin was aware only of Mr. Perry's call to the hotline, and was not privy to any other information.

less severe options for discipline that should have been pursued as opposed to termination.  Donahue Dep. at 132-135.

### *Public Accommodations Investigation by Guest Resources*

Because the Perrys' complaint was identified by Ms. Martin as implicating the Policy, she referred the matter to the Guest Resources Department for a full investigation, as required under the Consent Decree.  Guest Resources Specialist Deb Pincus was assigned to conduct a follow-up investigation of the events that culminated in Ms. Donahue's termination.  On November 6, 2007, Ms. Pincus interviewed Mr. Brenneke about the incident, who stated only that Mr. Perry had reported Ms. Donahue's comment to server, Ms. Green, but had refused to speak with a manager.  See Pincus Decl. Exh. 3. On November 7, 2007, Ms. Pincus took a statement from Ms. Green.  Ms. Green reported that, on the day the incident occurred, the Perrys told her that Ms. Donahue had asked them, "Did you guys hear about Chris Rock's mom suing Cracker Barrel?  You know she's going to win because she's black."  Id.  Ms. Green offered them the opportunity to speak with a manager, but they declined.  Id.  Ms. Pincus made notations of these interviews on the computerized record of the Perrys' complaint.  As part of her investigation, Ms. Pincus also reviewed the written statement previously submitted by Ms. Donahue and the written record of the Perrys' complaint to Cracker Barrel's toll-free hotline.

Following her investigation, Ms. Pincus determined that the information she had

10

gathered, including Ms. Donahue's personal written statement, confirmed the details reported by the Perrys, found that Ms. Donahue's behavior did violate Cracker Barrel's Public Accommodation Policy, and thus upheld Ms. Donahue's termination. Id. ¶ 18. According to Ms. Pincus, she did not review Ms. Donahue's age as part of her investigation nor did she have any independent knowledge of that information. Id. ¶ 17. Pursuant to the Consent Decree, Ms. Pincus then reported her findings and sent the information she had collected about the incident to an attorney for independent review, who signed off on Ms. Pincus's decision and closed the investigation.

### *Discipline of Other Cracker Barrel Employees*

Ms. Donahue contends that a younger employee, Jena Vasquez, received lesser discipline for a more serious infraction of Cracker Barrel's Public Accommodations policy. On November 6, 2004, approximately two years before the events culminating in this litigation took place, Jennifer Godfrey, a server at Store 116, got into a confrontation with four African-American guests who had requested a different server because they did not want Ms. Godfrey to wait on them. Ms. Godfrey then proceeded to stand in the vestibule of the store, waving her hands back and forth and singing an unidentified hip hop/rap song that used the term "nappy head" with another server, Jena Vasquez. Donahue Dep. at 27. It is unclear from the record whether the customers could see Ms. Godfrey and Ms. Vasquez or hear the song. According to Ms. Donahue, one of the customers subsequently wrote the word "bitch" on a piece of paper and held it up for

11

everyone in the dining room to see.  Id. at 25  An altercation followed between Ms. Godfrey and the customers in which a shouting and chair-shoving match ensued until a manager intervened.  Donahue Dep. at 24-25.  Ms. Godfrey was later fired, but Ms. Vasquez received only a final written warning as discipline, despite having three guest complaints in her file from 2002 and 2003.[6]  Exh. D-5.

Associate Manager David Hanson reported the incident to Cracker Barrel's home office and partnered with the Guest Resources Department to determine appropriate discipline.  Pincus Decl. ¶ 21; see Exh. 5.  Neither Ms. Martin nor Ms. Pincus was the Guest Resources Specialist assigned to investigate the incident.  At the time, Christine Moreno acted as the General Manager and Richard Trevey was the District Manager supervising Store 116.  Pincus Decl. ¶¶ 20-22.

### The Instant Litigation

On April 9, 2007, Ms. Donahue filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that she was discriminated against based on her age.  On October 19, 2007, Ms. Donahue received her dismissal and notice of rights and on January 16, 2008, filed her complaint in this action alleging that Cracker Barrel discriminated against her on the basis of age, in violation of the ADEA.  At the time of the events giving rise to this lawsuit, Ms. Donahue was fifty years of age.  Compl. ¶ 10.

---

[6] None of these complaints was related to race.  See Exh. D-5.

**Legal Analysis**

I.      **Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  Id. at 325.

13

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment.  Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available.  Seener v. Northcentral Technical Coll., 113 F.3d 750, 757 (7th Cir. 1997); Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 354 (7th Cir. 1996).  To that

14

end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination.  However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts.  <u>Giannopoulos v. Brach & Brock Confections, Inc.</u>, 109 F.3d 406, 410 (7th Cir. 1997).

## II.     Motion to Strike

On January 20, 2009, Ms. Donahue moved to strike [Docket No. 64] the following pieces of evidence submitted by Cracker Barrel: (1) paragraph twelve of the "Declaration of Deborah 'Deb' Pincus"; (2) paragraph nine of the "Declaration of Anita Martin"; and (3) Patti Green's written statement in its entirety.[7]  Cracker Barrel objects to Ms. Donahue's motion and contends that each of the exhibits is admissible under the Federal Rules of Evidence.  For the following reasons, we <u>DENY</u> Ms. Donahue's Motion to Strike.

Ms. Donahue moves to strike paragraph twelve of Ms. Pincus's initial declaration and paragraph nine of Ms. Martin's first declaration, contending that: (1) they are not based on personal knowledge; (2) they contain inadmissible hearsay; and (3) they are

---

[7] Ms. Donahue also moved to strike the October 20, 2008, letter from Erica Mason to Neal Eggeson discussing Ms. Donahue's efforts to mitigate her damages by searching for new employment.  Because, for the reasons detailed below, we are granting Cracker Barrel's Motion for Summary Judgment, we need not address the issue of mitigation of damages.  Accordingly, we <u>DENY AS MOOT</u> Ms. Donahue's motion to strike the October 20, 2008, letter.

irrelevant.  The paragraphs at issue in Ms. Donahue's motion to strike are identical,[8] each

providing as follows:

> On or about October 27, 2006, Mr. And Mrs. Perry reported to Cracker
> Barrel's Home Office that Plaintiff Pamela Donahue made an offensive and
> racially insensitive remark during a conversation with them regarding
> comedian Chris Rock's mother's claim of customer discrimination against
> Cracker Barrel.  Specifically, they reported that Ms. Donahue stated words
> to the effect that "Mrs. Rock will get what she sues for because she is black
> . . . blacks always get what they want."

Martin Decl. ¶ 9; Pincus Decl. ¶ 12.

It is true that neither Ms. Martin nor Ms. Pincus had personal knowledge regarding

the conversation that transpired between Ms. Donahue and the Perrys.  However, that

does not necessarily make the statements reported to Cracker Barrel inadmissible through

them.  As Cracker Barrel Guest Relations employees who work at the Home Office, both

Ms. Martin and Ms. Pincus have personal knowledge regarding the manner in which

guest complaints are received and recorded at Cracker Barrel and the investigative

process that ensues after such a complaint is lodged.  More specifically, as the supervisors

assigned to investigate the complaint made by the Perrys, they have personal knowledge

of the manner in which they received the complaint regarding the incident in question,

and therefore, Federal Rule of Evidence 602[9] does not bar their testimony here.[10]  <u>See</u>

---

[8] The only difference is that paragraph nine of Ms. Martin's declaration includes an
additional sentence, which provides: "As reflected in Guest Relations Ticket 625454 (attached as
Exhibit 3), I was initially responsible for addressing the complaint made by Cracker Barrel
guests Karen and Michael Perry."  Martin Decl. ¶ 9.

[9] Federal Rule of Evidence 602 provides in pertinent part that: "A witness may not testify
(continued...)

16

Sitar v. Indiana Dep't of Transp., 2001 WL 1388264, at *3 (S.D. Ind. Sept. 27, 2001)
(Tinder, J.).

Nor do these paragraphs constitute inadmissible hearsay, because Ms. Martin's and
Ms. Pincus's testimony is not offered to prove the truth of the matter asserted – that Ms.
Donahue actually made those statements.  Instead, their testimony goes to show their
basis for making and upholding the termination decision; it is therefore not precluded by
the rule against hearsay.  See id.  To the extent that Ms. Martin and Ms. Pincus testified
that these events actually occurred, such testimony will not be considered.  However, we
will consider the challenged paragraphs to the extent that they illuminate the state of mind
of the supervisors when they made their employment termination decisions.

Alternatively, Ms. Donahue contends that the subject testimony should be stricken
because it is not clear from the record when Ms. Martin or Ms. Pincus became aware of
the information contained in the Perrys' complaint to the hotline, and, thus, it is
irrelevant.  It is true that, because the testimony is being used by Cracker Barrel to
demonstrate a legitimate nondiscriminatory reason for terminating Ms. Donahue's
employment, it is relevant only insofar as it reveals information known to Cracker Barrel

---

[9](...continued)
to a matter unless evidence is introduced sufficient to support a finding that the witness has
personal knowledge of the matter."  Fed. R. Evid. 602.

[10] As explained in the advisory committee's notes to Rule 602, "This rule does not govern
the situation of a witness who testifies to a hearsay statement as such, if he has personal
knowledge of the making of the statement.  Rules 801 and 805 would be applicable.  This rule
would, however, prevent him from testifying to the subject matter of the hearsay statement, as he
has no personal knowledge of it."  Fed. R. Evid. 602 advisory committee's notes.

at the time the decision was made to terminate Ms. Donahue's employment.  However, the record shows that Ms. Martin initially viewed the Perrys' complaint at 12:38 p.m. on October 27, 2006, before she made the decision that Ms. Donahue should be terminated at 12:56 p.m.  To the extent that Ms. Donahue challenges this timeline, it creates at best a disputed issue of fact, not a basis for striking the testimony.

Similarly, Ms. Green's written statement is not hearsay as it is not being used to show that Ms. Donahue actually said what was reported in the document, but merely to demonstrate the state of mind of the decisionmakers at the time they made their employment decisions.  Because the statement is dated November 7, 2006, it is irrelevant for consideration in conjunction with Ms. Martin's original decision to terminate Ms. Donahue, which was made on October 27, 2006, eleven days earlier.  That does not mean the document is irrelevant for all purposes, however.  It is relevant as evidence that was before Ms. Pincus when she made the subsequent decision to uphold Ms. Donahue's discharge.  Thus, we will consider it only for that purpose.

For the foregoing reasons, we <u>DENY</u> Ms. Donahue's Motion to Strike.


**III.    ADEA Claim**

Ms. Donahue has chosen to attempt to prove discrimination indirectly within the <u>McDonnell Douglas</u> burden-shifting framework.[11]  <u>See</u> <u>McDonnell Douglas Corp. v.</u>

---

[11] This approach applies to claims brought under Title VII of the Civil Rights Act of

(continued...)

Green, 411 U.S. 792, 802-804 (1973).  Traditionally, under McDonnell Douglas, a

plaintiff must begin by establishing a *prima facie* case of discrimination, which requires a

showing that: (1) she is a member of a protected class; (2) her performance met her

employer's legitimate job expectations; (3) she suffered an adverse employment action;

and (4) the circumstances surrounding the adverse action indicate that it is more likely

than not that her age was the reason for it, which may be demonstrated by showing that

her employer treated similarly situated employees outside of the protected class more

favorably.  See Elkhatib v. Dunkin Donuts, Inc., 493 F.3d 827, 830 (7th Cir. 2007).  If the

plaintiff succeeds in establishing a *prima facie* case of discrimination, the burden then

shifts to the defendant to articulate a nondiscriminatory reason for the actions it took

against the plaintiff.  If the defendant can offer a legitimate, nondiscriminatory reason for

the employment decision, the burden reverts back to the plaintiff to show that there is a

genuine dispute of material fact that the proffered reason for the employment action is

pretextual.  Nese v. Julian Nordic Constr. Co., 405 F.3d 638, 641 (7th Cir. 2005).

     The parties do not dispute that Ms. Donahue, whose age is over forty years, is a

member of a protected class or that she suffered an adverse employment action.

However, Cracker Barrel contends that, in light of her violation of its Public

Accommodations Policy, Ms. Donahue was not meeting its legitimate job expectations,

-----

[11](...continued)
1964, as well as claims brought under the ADEA.  Barricks v. Eli Lilly and Co., 481 F.3d 556,
559 (7th Cir. 2007) (citing Raymond v. Ameritech Corp., 442 F.3d 600, 610 (7th Cir. 2006)).

and further, she is unable to point to a similarly situated employee who is outside of the protected class and was treated more favorably.  Cracker Barrel also argues that Ms. Donahue has presented no evidence to demonstrate that its proffered reason for her termination – her alleged violation of the Policy – was pretext for discrimination.

Ms. Donahue denies that her conduct violated the Policy and maintains that she was meeting her employer's legitimate job expectations.  She contrasts her conduct with the conduct of an allegedly similarly situated younger employee in an attempt to demonstrate that Cracker Barrel applied its legitimate job expectations against her in a disparate manner.  In addition, she argues that, in light of the fact that her conduct did not violate the Policy, Cracker Barrel's proffered reason for her termination is pretextual.  According to Ms. Donahue, the issues of legitimate job expectations, similarly situated employees, and pretext are all intertwined, and thus, we must eschew the traditional application of the <u>McDonnell Douglas</u> burden shifting analysis and consider instead the evidence as a whole to determine whether she has raised a genuine issue of material fact as to whether Cracker Barrel discriminated against her on the basis of her age.

As noted above, courts generally must first determine whether the plaintiff has established a *prima facie* case before subjecting an employer to the pretext inquiry.  <u>Hague v. Thompson Distribution Co.</u>, 436 F.3d 816, 823 (7th Cir. 2006) (citations omitted).  However, "in many employment discrimination cases, the second element of the prima facie case, satisfactory job performance, and the issue of pretext focus on the same circumstances because the employer maintains that the discharge was based on its

reasonable belief that the employee was not performing in an acceptable manner."  Denisi v. Dominick's Finer Foods, Inc., 99 F.3d 860, 864 (7th Cir. 1996), cited in Vanasco v. National-Louis University, 137 F.3d 962, 966 (7th Cir. 1998); see also Coco v. Elmwood Care, Inc., 128 F.3d 1177, 1179 (7th Cir. 1997) ("The defendant's expectations are not legitimate if they are phony; so if they are argued to be phony, the issue of legitimate expectations and the issue of pretext seem to merge.").  In such circumstances, the Seventh Circuit has reasoned that, "[b]ecause the issue of satisfactory job performance, which lies at the heart of this dispute, must be analyzed at both stages of the McDonnell Douglas test, it is therefore simpler to run through that analysis only once."  Simmons v. Chicago Bd. of Educ., 289 F.3d 488, 492 (7th Cir. 2002); accord Hague, 436 F.3d at 823. Accordingly, though we recognize that the *prima facie* case is technically the first step in the burden shifting analysis, we focus here on the pretext inquiry.

Cracker Barrel claims that it had a legitimate, nondiscriminatory reason for terminating Ms. Donahue: her alleged violation of the Store's Public Accommodations Policy.  The burden therefore shifts to Ms. Donahue to show that her employer's proffered reason is pretextual, which means "a dishonest explanation, a lie rather than an oddity or an error."  Kulumani v. Blue Cross Blue Shield Ass'n, 224 F.3d 681, 685 (7th Cir. 2000) (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147-148 (2000)).  In other words, it is not within our purview to determine whether Cracker Barrel's decision to terminate Ms. Donahue was a correct and prudent decision; as long as the evidence makes clear that Cracker Barrel honestly believed at the time of her

termination that Ms. Donahue had made comments that violated its Public

Accommodations Policy, Ms. Donahue cannot meet her burden to establish pretext.

However, if Cracker Barrel's explanation rings false, we may infer that the employer is

attempting to cover up a discriminatory purpose.  See Reeves, 530 U.S. at 147.

Ms. Donahue first claims that Cracker Barrel's reason for terminating her is

factually baseless.  She contends that we must assume that the only statement she made to

the Perrys was the following statement to which she testified at her deposition:

> Michael, they are black.  Cracker Barrel will settle with them out of court so
> it is not public knowledge.  If it is public knowledge, you and I can find out
> how much they can get, and they don't want that, so they'll settle out of
> court.

Donahue Dep. at 139-40.  According to Ms. Donahue, no reasonable finder of fact could

find this statement to be "racially offensive" so as to violate the Public Accommodations

Policy and would thus have to assume that Cracker Barrel's proffered reason for her

termination was a lie.  However, Ms. Donahue misunderstands the scope of the pretext

inquiry.  She concedes that the version of the conversation with the Perrys that she

recounted in her deposition was never reported to Cracker Barrel.  It is not within our

purview to determine what actually transpired between Ms. Donahue and the Perrys.

Rather, we focus only on the information that was before Cracker Barrel at the time of her

termination, as all that matters for purposes of the pretext inquiry is how the individuals

responsible for her termination honestly interpreted the information about the incident

*that was available to them at the time they made their decision*.

22

The timeline of events, as recorded in the Perrys' Guest Relations Ticket, is as follows: On October 27, 2006, at 11:02 a.m., Mr. Perry called into Cracker Barrel's toll-free hotline and reported that, in reference to Chris Rock's mom suing Cracker Barrel, Ms. Donahue had stated "you know they are black so they'll get what they want. . . . that's how it goes and the blacks always get what they want."[12]  Martin Decl. Exh. 3.  Mr. Perry also stated that he was offended by Ms. Donahue's comment and that he would no longer eat at Cracker Barrel if he had to be served by her.  At 12:30 p.m., the Ticket was emailed to Ms. Martin, the Guest Relations employee assigned to investigate the complaint, who reviewed it at 12:38 p.m.  By 12:56 p.m. that same day, Ms. Martin had spoken with Mr. Brenneke, who informed her that the Perrys had complained to Ms. Green before they left Store 116 that morning.  At that point, Ms. Martin instructed Ms. Brenneke to terminate Ms. Donahue at the end of the day.[13]

---

[12] Ms. Donahue contends that unidentified Cracker Barrel Guest Relations employees inserted this statement into the Ticket at some point after the initial complaint was recorded and after she was terminated in order to create a *post hoc* explanation for her discharge.  However, our review of the record does not reveal evidence that any Cracker Barrel employee inaccurately reported or otherwise manipulated the statement contained in the Ticket.  Both Ms. Martin and Ms. Pincus testified by declaration that the version of the events contained in the Ticket in evidence is the information they relied upon in making their termination decisions.  Further, in Ms. Donahue's own written account of the event, dated October 27, 2006, she recounted that she had made a substantially similar statement to the statement attributed to her in the Ticket.  Therefore, we find Ms. Donahue's conclusory assertion that Cracker Barrel tampered with the information contained in the Ticket to be wholly unsupported by the record.

[13] The parties dispute whether Ms. Martin reviewed Ms. Donahue's written statement before she made the termination decision.  The statement is dated October 27, 2006, the day that Ms. Donahue was terminated, but there is no time stamp or other evidence to determine exactly when it was written.  Therefore, because at this stage we are required to view the facts in the light most favorable to the nonmovant, we assume that Ms. Martin did not review Ms.

(continued...)

Ms. Donahue contends that the fact that Ms. Martin decided to terminate her based only on the Perrys' version of events, without first asking for her side of the story or conducting any other interviews, is evidence that Cracker Barrel's proffered reason was not the actual motivation for her discharge. It is true that this court has found that a defendant's failure to adequately investigate a plaintiff's actions, *when combined with other evidence that casts doubt on the sincerity of the proffered rationale for termination*, can raise an inference that unlawful discrimination was the true motivation, thereby permitting a plaintiff to survive summary judgment. See Noeth v. Autozone Stores, Inc., 2007 WL 1396428 (S.D. Ind. May 3, 2007) (Young, J.) (denying summary judgment on plaintiff's ADEA claim, citing the defendant's "superficial investigation," combined, *inter alia*, with "a plethora" of examples of substantially younger employees who engaged in similar behavior but were not terminated). However, even assuming Cracker Barrel's investigation was inadequate (and we are not saying that it was), we find no additional evidence here that would raise such an inference of discrimination.

Unlike the circumstances in Noeth, where the plaintiff had presented evidence that at least twenty-five substantially younger employees had engaged in similar behavior as the plaintiff but were not terminated, Ms. Donahue has failed to show even one such example. Ms. Donahue claims that Cracker Barrel strictly enforced its Public Accommodations Policy against her, but was more lenient in its application of the Policy

---

[13](...continued)
Donahue's October 27, 2006, written statement before instructing Mr. Brenneke to fire her.

against a similarly situated, younger employee, Jena Vasquez.  We are not persuaded.

For an employee to be similarly situated to a plaintiff for purposes of <u>McDonnell Douglas</u>

comparison, a plaintiff "must show that there is someone who is directly comparable to

[him or] her in all material respects."  <u>Patterson v. Avery Dennison Corp.</u>, 281 F.3d 676,

680 (7th Cir. 2002).  While "[a] similarly situated employee need not be 'identical,' . . .

the plaintiff must show that the other employee dealt with the same supervisor, [was]

subject to the same standards, and had engaged in similar conduct without such

differentiating or mitigating circumstances as would distinguish [her] conduct or the

employer's treatment of [her]."  <u>Caskey v. Colgate-Palmolive Co.</u>, 535 F.3d 585, 592 (7th

Cir. 2008) (citations omitted).  It is undisputed that both Ms. Donahue and Ms. Vasquez

held the position of server and were subject to the same standards.

However, the incident involving Ms. Vasquez occurred in November 2004,

approximately two years before the events transpired giving rise to this lawsuit.  None of

the decisionmakers involved in Ms. Vasquez's case were involved in determining what

disciplinary action would be taken against Ms. Donahue.  In 2004, Ms. Pincus, the Guest

Relations Specialist who upheld Ms. Donahue's termination, was not even employed at

Cracker Barrel at that time, much less the Cracker Barrel employee assigned to

investigate the incident involving Ms. Vasquez.  Further, Ms. Martin, who made the

initial decision to terminate Ms. Donahue, was not assigned to investigate the incident

involving Ms. Vasquez, nor was she associated with that incident in any other capacity.

Additionally, Ms. Donahue's and Ms. Vasquez's immediate supervisors were also

different.  In 2004, Christine Moreno was the General Manager and Richard Trevey was the District Manager of Store 116.  In contrast, Ms. Donahue was supervised by General Manager Todd Brenneke and District Manager Patrick Armstrong.

The fact that, at the time the respective employment decisions were made, Ms. Donahue and Ms. Vasquez did not have any of the same supervisors is sufficient in itself to preclude a showing of similarity here.  It is well established under Seventh Circuit caselaw that "[d]ifferent employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently."  Radue v. Kimberly-Clark Corp., 219 F.3d 612, 618 (7th Cir. 2000) (citations omitted).  Nevertheless, Ms. Donahue contends that the lack of commonality in supervisors is irrelevant here because neither Ms. Vasquez's nor Ms. Donahue's supervisors were allowed to exercise discretion in their employment decisions that would otherwise account for the disparity in treatment.  In support of this contention, Ms. Donahue points to Ms. Pincus's and Ms. Martin's declarations in which they each testified that "when an accused employee admits to making comments that violate Cracker Barrel's Public Accommodations Policy, this is automatic grounds for termination."  Pincus Decl. ¶ 9; Martin Decl. ¶ 8.

It may be true that once an employee admits to making statements that Cracker Barrel has deemed violative of its Public Accommodations Policy, decisionmakers in the Guest Relations Department have no discretion to determine a lesser punishment at that

26

juncture because such an offense is grounds for automatic dismissal.  However, this does not mean that the supervisors are completely without discretion throughout the entire disciplinary process.  To the contrary, Guest Relations employees undoubtedly exercise significant discretion in determining whether the statements that have been admitted to, do, in fact, violate the Policy.

For example, in Ms. Vasquez's case, she eventually admitted to singing song lyrics that included the term "nappy head" in earshot of four African-American customers.  However, Cracker Barrel supervisors assigned to investigate the incident exercised their discretion in assessing Ms. Vasquez only a final written warning for her behavior because they determined that it could not be established that she participated in the singing with knowledge of another server's (Ms. Godfrey's) dispute with the four guests or that the song was motivated by the customers' race.  Regardless of any other similarities between the two women, the fact that two years later, entirely new and different Cracker Barrel supervisors exercised their discretion in a different manner and found that the allegedly less offensive statement made by Ms. Donahue *was* racial in character and thus violated the Public Accommodations Policy is insufficient to raise an inference of discrimination or demonstrate that Cracker Barrel's proffered reason for Ms. Donahue's discharge was not the actual reason for her discharge.

There is also no evidence in the record that either Ms. Martin, who made the initial decision to terminate Ms. Donahue, or Ms. Pincus, who subsequently upheld the termination decision, was ever aware of Ms. Donahue's age.  Ms. Donahue contends that

the suspicious timing of her termination creates an inference that age was most likely the

reason for Cracker Barrel's termination decision.  She claims the fact that she was

discharged the day after she received her fifteen-year service pin from Cracker Barrel

renders it "inconceivable" that Cracker Barrel lacked knowledge of her age.  However, as

Cracker Barrel points out, any employee who began working for the store between the

ages of sixteen and twenty-four and remained continuously employed with the company

for fifteen years could have received the same pin and still been outside of the ADEA's

protected class.  There is no evidence to suggest that either Ms. Martin or Ms. Pincus,

both of whom worked in Cracker Barrel's home office located in Lebanon, Tennessee,

were aware of the age at which Ms. Donahue began employment with Store 116 in

Indianapolis, Indiana, or that she had just received her fifteen-year anniversary pin the

day before she was discharged.  Further, even if they were aware of the length of her

career with Cracker Barrel, years of service is not a proxy for age for purposes of the

ADEA.  See Hazen Paper Co. v. Biggins, 507 U.S. 604, 612 (1993) ("[A]ge and years of

service are analytically extinct."); see also Anderson v. Baxter Healthcare Corp., 13 F.3d

1120, 1125-26 (7th Cir. 1994).   Therefore, we are unable to conclude that Ms. Donahue's

evidence of timing constitutes evidence sufficient to raise an inference of discrimination

or renders Cracker Barrel's proffered reason for her termination unworthy of belief.

　　　Nor do we find anything suspicious about Ms. Pincus's subsequent decision to

uphold Ms. Donahue's discharge.  Following Ms. Martin's termination decision, Ms.

Pincus conducted an audit of the evidence supporting Ms. Donahue's discharge.  As part

of her investigation, Ms. Pincus collected additional information regarding Ms. Donahue's exchange with the Perrys, including Ms. Donahue's personal statement, which corroborated Mr. Perry's account of the incident.  Regardless of what Ms. Donahue now contends that she actually said to the Perrys, she concedes that, at the time Ms. Pincus upheld the termination decision, the only statement that Cracker Barrel had in its possession from her was the written document dated October 27, 2006, in which Ms. Donahue stated that she had told the Perrys that Mrs. Rock "will get what [she] sue[s] for," and "they were black, so they would get it."  Donahue Dep. Exh. 15.

We find Ms. Donahue's written version of her exchange with the Perrys, authored on the day of her termination, to be substantially similar to the account Cracker Barrel received from Mr. Perry, who reported in his complaint to the toll-free hotline that Ms. Donahue had stated: "[W]ell you know they are black so they'll get what they want. . . . [T]hat's how it goes and the blacks always get what they want." Martin Decl. Exh. 3.  In addition, as part of her investigation, Ms. Pincus reviewed a written statement provided by Ms. Green, who reported that Mr. Perry had told her that he and his wife were upset because Ms. Donahue had stated that Chris Rock's mom "was going to sue Cracker Barrel and she would win because she's black."  Pincus Decl. Exh. 4.  After reviewing the three, largely consistent accounts of the events that transpired on October 27, 2006, (including one from Ms. Donahue herself), all of which Ms. Pincus had before her when she upheld Ms. Donahue's termination, we cannot conclude that Cracker Barrel's proffered reason for her discharge is factually baseless or unworthy of belief.

Because Ms. Donahue has not succeeded in establishing that issues of material fact exist which might demonstrate that Cracker Barrel's proffered explanation is pretextual, we <u>GRANT</u> Cracker Barrel's Motion for Summary Judgment.

## IV.   Conclusion

For the foregoing reasons, we <u>DENY</u> Ms. Donahue's Motion to Strike and <u>GRANT</u> Cracker Barrel's Motion for Summary Judgment.  Final judgment will be entered accordingly.

Date: _____07/02/2009_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Nathan A. Baker
BARNES & THORNBURG
nbaker@btlaw.com

Neal Frederick Eggeson Jr.
EGGESON APPELLATE SERVICES
nfe1@aol.com

David E. Gevertz
BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, PC
dgevertz@bakerdonelson.com

John H. Haskin
HASKIN LAUTER  & LARUE
jhaskin@hlllaw.com

Erica V. Mason
BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, P.C.
emason@bakerdonelson.com

Richard W. McMinn
HASKIN LAUTER  & LARUE
rmcminn@hlllaw.com